**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DANIEL JOSEPH KUDRON, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 4:18-cv-00233-SMR-CFB |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| SHERIFF WILLIAM McCARTHY, | ) | **on Defendants' Motions to Dismiss** |
| WELLPATH, LLC, | ) | **(ECF 30, 59) and Motion for** |
| DR. WILLIAM INGRAM, and | ) | **Summary Judgment (ECF 48)** |
| DR. EDWARD O'BRIEN, | ) | |
| | ) | |
| Defendants. | ) | |

## I.    INTRODUCTION

Plaintiff Daniel J. Kudron brings his claims for money damages pursuant to 42 U.S.C. § 1983, alleging that former Polk County Sheriff William McCarthy;[1] Iowa Department of Corrections ("IDOC") physician Dr. Edward O'Brien; Wellpath, LLC ("Wellpath"); and physician Dr. William Ingram, who was employed by Wellpath at the Polk County Jail ("PCJ"), all in their individual capacities, violated his Eighth and Fourteenth Amendment rights while he was a pretrial detainee at the PCJ and after he was sentenced to the custody of the IDOC. He alleges that all Defendants: (1) acted with deliberate indifference to his serious medical needs by failing to provide him adequate medical care and treatment after he was injured in a 2016 fight with another inmate at the PCJ; and (2) failed to protect his health at the PCJ and at state correctional facilities by failing to provide him adequate nutrition, a bunk assignment suited to his injuries, or a proper mattress. (ECF 42).

---

[1] Sheriff McCarthy retired in 2018. Kudron asserts his claims against Defendant McCarthy in his individual capacity (ECF 42), but later admits that his claims against former Sheriff McCarthy relate only to the administration of PCJ policies, and not any individual actions McCarthy took toward Kudron. (ECF 35-1). Since Kudron's claims address Defendant McCarthy in both his individual and official capacities, and because Defendant McCarthy has not moved for substitution of the current Polk County Sheriff Keven Schneider, the Court will not automatically substitute the current sheriff pursuant to Fed. R. Civ. P. 25(d).

Prior to this case, Kudron filed two other related cases in the U.S. District Court for the Northern District of Iowa. The first *pro se* Complaint was filed on September 5, 2017, while Kudron was incarcerated at the Fort Dodge Correctional Facility ("FDCF"). *See Kudron v. Fort Dodge Correctional Facility*, Case No. 3:17-cv-03075-LLR, dkt. no. 1 (N.D. Iowa 2017) ("*Kudron I*"). This case was dismissed without prejudice on October 26, 2017, for Kudron's failure to comply with the Federal Rules of Civil Procedure, including his failure to name any individual Defendant. *Id.* at dkt. no. 5. The Court also considered that Kudron filed a second, related action while *Kudron I* was pending. *See Kudron v. Iowa Department of Corrections, et al.* Case No. 3:17-cv-03079-LRR, dkt. no. 1-1 (N.D. Iowa 2017) ("*Kudron II*").

In *Kudron II*, docketed by the Clerk of Court on September 28, 2017, Kudron alleged in his *pro se* Complaint that the following ten defendants were deliberately indifferent to his serious medical needs and failed to protect his health: the IDOC, the FDCF, Robert Johnson, Don Harris, Tony Comp, Todd Carver, Karen Anderson, Jane Hacker, Classification Committee, Iowa Medical and Classification Center ("IMCC"), and the PCJ. *Id.* Among other things, Kudron claimed that these Defendants violated his constitutional rights when they:

(1) failed to timely remove his sixteen sutures following an August 2016 assault at PCJ;
(2) failed to provide proper nutrition according to his height and weight, causing him to be "twenty pounds underweight";
(3) failed to provide the proper antibiotics or pain relievers for his injuries;
(4) failed to provide him proper bunk assignments or a proper mattress;
(5) only provided him "basic" medical care upon transfer to IMCC, where staff trivialized his pain and suffering; and
(6) provided him a blue, unmarked bottle of soap that he believed caused his cancerous lump that was removed in September 2017.

*Id.* Kudron supplemented his Complaint in *Kudron II* with several grievances related to these claims. *Id.* at dkt. no. 2.

On December 19, 2017, the Court found upon Initial Review that Kudron's claims related to his dissatisfaction with his medical treatment at FDCF following the removal of his cancerous lump while he was living in Mount Pleasant Correctional Facility ("MPCF"), did not give rise to a viable claim under 42 U.S.C. § 1983. *Id.* at dkt. no. 5. The Court also found that Kudron's allegations related to his exposure to cleaning products, sleeping arrangements, and access to food and water while at FDCF did not indicate that Kudron was deprived of a constitutionally protected right. *Id.* The Court declined to consider any claim associated with Kudron's confinement at PCJ, IMCC, or MPCF, as these institutions are located in the Southern District of

Iowa. *Id.* Because the claims related to the institutions in the Southern District of Iowa were unrelated to the events that allegedly occurred in the Northern District of Iowa, the Court dismissed the claims that Kudron alleged to have occurred in the Southern District of Iowa without prejudice, providing directions:

> [P]laintiff should complete and file an additional complaint in the Southern District of Iowa if he intends to pursue claims that concern events that occurred in the Southern District of Iowa and defendants that are located in the Southern District of Iowa. Such complaint should omit claims that involve events that occurred in the Northern District of Iowa and are against defendants that are located in the Northern District of Iowa.

*Id.*

On January 30, 2018, Kudron brought this *pro se* Complaint, *Kudron III,* pursuant to 42 U.S.C. § 1983, again in the Northern District of Iowa. (*See* ECF 4; *Kudron v. Bartruff, et al.*, 3:18-cv-03010-LRR (N.D. Iowa 2018)). He named four Defendants: (1) Jerry Bartruff, Director of the IDOC; (2) Jay Nelson, Warden of MPCF; (3) Bill McCarthy, Polk County Sheriff during the relevant time period; and (4) James McKinney, Warden of IMCC. The substance of Kudron's allegations in *Kudron III* were identical to his previous allegations in *Kudron II*. Because a substantial portion of Kudron's allegations against the named Defendants took place in the Southern District of Iowa, and in light of the Court's previous ruling in *Kudron II* that Kudron's claims against FDCF did not amount to a constitutional violation, *Kudron III* was transferred to this District on July 19, 2018. (ECF 2). Kudron is now represented by counsel, who appeared *pro bono publico* on August 21, 2018. (ECF 6). Kudron has amended his Complaint twice (ECF 17, 42), so that the current Defendants are McCarthy, Wellpath, Dr. Ingram, and Dr. O'Brien.

This case was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) on November 26, 2019 (ECF 49). Three dispositive motions are pending: (1) Defendants Wellpath's and Dr. Ingram's Motion to Dismiss (ECF 59); (2) Defendant McCarthy's Motion to Dismiss (ECF 30); and (3) Defendant Dr. O'Brien's Motion for Summary Judgment. (ECF 48). Kudron resists these motions. (ECF 69, 35, 68). Defendants Dr. Ingram and Wellpath filed a Reply in support of their Motion to Dismiss. (ECF 70). The matters are now fully submitted.

## II.    FACTUAL BACKGROUND

For the purposes of this Report and Recommendation on Defendants' Motions to Dismiss (ECF 30, 59), the Court considered all of Kudron's factual allegations to be true; however, it did not accept his legal conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The

Court reviewed the evidence and reasonable inferences related to Defendant's Motion for Summary Judgment (ECF 30) in the light most favorable to Kudron, the nonmoving party. *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680 (8th Cir. 2012). This standard does not require the acceptance of "unreasonable inferences or sheer speculation as fact." *Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007) (quoting *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004)).

Kudron was incarcerated at the PCJ from July 5, 2016 (ECF 42 at ¶ 5), until April 13, 2017. (Def.'s Ex. B, at ECF 48-3 at 30). According to IDOC's Offender Movement Summary, after Kudron was sentenced, he was transferred from the PCJ to IMCC, and incarcerated there until May 4, 2017; he then transferred to the MPCF until July 17, 2017. *Id.* Kudron transferred from MPCF to the FDCF until he received work release on October 23, 2018. *Id.* On April 24, 2019, Kudron's work release status was revoked, and he was assigned to the Newton Correctional Facility ("NCF"), where he currently resides. *Id.*

During the time relevant to Kudron's claims, Defendant McCarthy was the Sheriff for Polk County, Iowa. (ECF 42 at ¶ 6). Defendant Wellpath, LLC, was a corporation that contracted with Polk County, Iowa to provide medical services to PCJ inmates. (*Id.* at ¶ 7). Defendant Dr. Ingram was employed by Wellpath. (*Id.* at ¶ 8). Defendant O'Brien was employed as a doctor for the IDOC and assigned to IMCC. (*Id.* at ¶ 9).

## A. Relevant Medical History and Related Facts

In August 2016, Kudron was 33 years old when he was assaulted by another inmate at the Polk County Jail, and suffered a massive laceration that partially severed his nose. (ECF 42 at ¶ 12–13; Pl.'s Aff., ECF 68-3 at ¶ 3).[2] Kudron received sixteen sutures. (ECF 42 at ¶ 14). He states that he suffered a deviated septum, brain trauma, and permanent injuries to his back and neck from the assault. (*Id.* at ¶ 15–16). At the PCJ, he received treatment from Wellpath staff, including Defendant Dr. Ingram. (*Id.* at ¶ 17). Kudron stated that Dr. Ingram told him that his sixteen sutures in his nose would dissolve after a short period of time. *Id.* Kudron asserts that the sutures did not dissolve, became infected, and then were not properly removed by Wellpath staff. (*Id.* at ¶ 17–18). Kudron alleges that Wellpath provided "mediocre" medical care while he was at

---

[2] Kudron's Affidavit, submitted in support of his Resistance to Defendant O'Brien's Motion for Summary Judgment (ECF 68-3), states nearly the identical facts as he alleged in the Second Amended Complaint. (ECF 42). The Court will cite only to the Second Amended Complaint where the alleged facts are the same, and note the few instances where Kudron's Affidavit (ECF 68-3) provided greater detail.

the PCJ. (ECF 42 at ¶17). He claims that a blood infection due to the failure to timely remove his sutures caused further trauma to his sinuses and brain. (ECF 42 at ¶ 18; ECF 68-3 at ¶ 8).

Kudron does not assert that Dr. Ingram treated him again after he received the sutures, or that he requested care from Dr. Ingram for his infection. Kudron alleges that while he was at the PCJ, he did not receive adequate pain medication or antibiotics following his assault, which caused him pain. (ECF 42 at ¶ 19, 23–24). There are no other allegations in the Second Amended Complaint against Wellpath or any of its other staff members. None of Kudron's medical records relating to any of Kudron's complaints, either from the PCJ, IMCC, or any health care provider were submitted in the record. Kudron offered no medical expert opinions about his treatment or damages.

Kudron also complains that due to policies at the PCJ and IDOC, he was not provided the appropriate food for his height and weight, causing him to be twenty pounds underweight when he transferred to IMCC. (*Id.* at ¶ 19–20, 22). Nothing in the record provides Kudron's weight at PCJ intake, discharge, or any other time.[3] Kudron claims that he was then put at further risk of injury, including resulting back and neck issues, when he was denied a lower bunk at the PCJ and while in IDOC custody; he stated that his "severe depth perception issues" made it difficult to navigate to and from his bunk. (*Id.* at ¶ 24–25). There is nothing in the record indicating that he requested a different bunk assignment at PCJ or IMCC, or detailing the height of the bunk he was assigned, or that was available, at any of the institutions where he was housed. Kudron also asserts that he was denied access to a different mattress at PCJ, which he believes would have alleviated pain from his damaged vertebrae, although there is no evidence that he requested a different mattress from any Defendant, that he had damaged vertebrae, or that any other type of mattress would have caused him less pain. (*Id.* at ¶ 26). In his Affidavit, Kudron describes two complaints about his bunk assignment at FDCF, for which he submitted grievances. (ECF 68-3 at ¶ 19, 28). Because neither FDCF nor any FDCF officials are Defendants in this instant case, and this Court has previously held that that Kudron is precluded from raising claims against FDCF again in this District (ECF 5), the Court finds that these grievances are not relevant to his instant claims, other than to note that Kudron was aware of the grievance process at FDCF.

Upon Kudron's arrival at IMCC on April 13, 2017, IMCC medical staff performed a "basic" intake physical examination and questioned Kudron about his medical history.

---

[3] In his Affidavit, Kudron stated that he was 6'6", but he did not provide his weight. (ECF 68-3 at ¶ 10).

(ECF 42 at ¶ 27). Kudron felt that Dr. O'Brien and IMCC staff trivialized his pain and suffering during this process, as Kudron was only able to discuss his previous injuries and describe his current pain and suffering, but did not have time to discuss his current and long-term injuries. (ECF 68-3 at ¶ 13). Kudron does not allege that he requested treatment from Dr. O'Brien for any of his "current or long-term" injuries beyond his pain, or that Dr. O'Brien otherwise had contact with Kudron after this initial intake examination. Kudron left IMCC on May 4, 2017. (Def.'s Ex. B, at ECF 48-3 at 30).

During his three weeks at IMCC, Kudron was provided an unmarked bottle that contained a blue substance with a strange odor for use as soap and shampoo. (ECF 42 at ¶ 28). Kudron requested a different soap and shampoo, but his request was denied by unidentified IMCC staff. *Id.* Kudron informed IMCC staff that he believed that the unmarked bottles were an OSHA violation. (*Id.* at ¶ 29). Prison staff told Kudron that the soap was called Sky Blue and produced by Iowa Prison Industries. (*Id.* at ¶ 31). He asked for a Material Safety Data Sheet, but was denied. *Id.* Kudron's subsequent requests for a different soap or additional information about the blue soap were denied by unidentified IMCC staff. (*Id.* at ¶ 32). Kudron does not allege that he was treated by, or had any contact with, Dr. O'Brien relating to his concerns about the ingredients in this blue soap.

Kudron claims that during March to May 2017, he discovered a lump on his hairline, which was tender and sore. (*Id.* at ¶ 30, 32). Kudron believes this lump was caused by the blue, unmarked soap he was given at IMCC. (ECF 68-3 at ¶ 16–17). The Court notes that Kudron was at the PCJ until April 13, 2017, then at IMCC until May 4, 2017. He does not allege that anyone at the PCJ, Wellpath, Dr. Ingram, or Dr. O'Brien failed to provide medical care for this lump, or that any Defendant was ever aware of this condition.

Kudron transferred to MPCF on May 4, 2017, where Dr. Tobin Jacks examined this lump and performed a biopsy. (*Id.* at ¶ 33). Kudron was diagnosed with a basal cell carcinoma. Kudron transferred to FDCF on July 17, 2017, and FDCF staff arranged for an outpatient procedure at the University of Iowa Hospitals and Clinics on September 1, 2017. (*Id.* at ¶ 34–36). The lump on Kudron's head was removed. (*Id.* at ¶ 35). Kudron did not submit any medical records relating to the diagnosis, treatment, or prognosis of this basal cell carcinoma. He asserts that its removal should not have been performed as an out-patient procedure, because his return to FDCF on the same day was uncomfortable. (*Id.* at ¶ 36).

**B. Polk County Jail Policies – Nutrition and Bunk Assignment**

In support of his Motion to Dismiss (ECF 30), Defendant McCarthy submitted Exhibits A and B, PCJ's policies on Nutrition and Bunk Assignment. The Court takes judicial notice of these public records pursuant to Fed. R. Evid. 201(c). The PCJ policies are not in dispute, and their authenticity is not questioned. *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting *Enervations, Inc. v. Minn. Mining & Mfg. Co.,* 380 F.3d 1066, 1069 (8th Cir. 2004)) (stating that for a Motion to Dismiss, the Court may consider those documents whose contents are alleged in the Complaint and whose authenticity no party questions).

Kudron asserts that all Defendants failed to provide him proper nutrition, but the facts in his Second Amended Complaint only relate to his claim of lack of proper nutrition while at PCJ. (*See* ECF 42 at ¶ 19–20, 22). PCJ's nutrition policy provides that inmates receive three meals per day during designated meal times in each housing unit. (Ex. A, ECF 30-1). The policy provides for meals determined as "nutritionally complete" and approved by a licensed dietitian. *Id.* Special diets are available for inmates who require them for medical or religious reasons, upon submission of a request to the PCJ medical staff. *Id.* PCJ does not serve pork, and additional food items are available for an inmate's purchase from the commissary. *Id.*

Kudron also asserts that he was subjected to pain and suffering because all Defendants denied him "lower" bunk assignments, and that at PCJ he lacked a "proper" mattress. (*See* ECF 42 at ¶ 24–26). PCJ's bunk assignment policy provides criteria for inmates to qualify for a bottom bunk, such as specific medical issues (e.g., broken limbs, over age 65, using assistive devices) and conditions medically indicated on a case-by-case basis. (Ex. B, ECF 30-2). There is nothing in the record indicating that Kudron asked anyone at the PCJ (including Wellpath staff or Dr. Ingram) for any accommodation for his bunk assignment or type of mattress based upon his medical needs. Kudron did not state any facts in his Second Amended Complaint relating to his bunk or mattress assignment while at IMCC, or requesting a specific bunk assignment from anyone at IMCC, including Dr. O'Brien.

**C. Grievance Procedures**

Kudron does not assert that he used any available grievance procedure at the PCJ or IMCC, or that he communicated with a named Defendant regarding his complaints about medical treatment, bunk assignments, or mattresses while at PCJ or IMCC. (*See* ECF 48-3 at 31).

Kudron was aware of the IDOC's Grievance Procedures, as he used them at MPCF and FDCF. *Id*.

IDOC maintains a state-wide policy for offender grievance procedures, under Policy IO-OR-06, effective February 2017. (*See* ECF 48-3 at 22–29). The Offender Grievance Procedures "provide offenders an internal mechanism designed to resolve legitimate complaints and improve institutional operations." (ECF 48-3 at 23). The Grievance Policy provides several remedies that inmates may request upon submitting a grievance, such as: change or modification to departmental or facility policy, procedure or practice; change in current medical care, medication or diet; and any other relief within the power of the Grievance Officer, Warden, or Assistant Deputy Director of Institutional Operations. (ECF 48-3 at 28).

Prior to filing this lawsuit, *Kudron III*, in the Northern District of Iowa on January 30, 2018, Kudron had filed seven grievances during his time in the IDOC. (ECF 48-3 at 31). He filed two at MPCF on July 15, 2017, about MPCF staff behavior in relation to a disciplinary incident; and five at FDCF between August and December 2017. (*See* ECF 48-3, at 31–61). Kudron filed two other grievances at FDCF in February and April 2018. (ECF 48-3 at 31).

### III.  PROCEDURAL HISTORY

Kudron's two related cases were filed in the U.S. District Court for the Northern District of Iowa in September 2017. *Kudron I* was dismissed for failure to comply with the Federal Rules of Civil Procedure on October 26, 2017, including for Kudron's failure to name any individual Defendant. While *Kudron I* was pending, Kudron filed a second case, *Kudron II*, on September 28, 2017. In that case, Kudron claimed that ten individual Defendants were deliberately indifferent to his serious medical needs and failed to protect his health at PCJ and several other IDOC facilities. On December 19, 2017, upon Initial Review of *Kudron II*, the Court found that Kudron failed to identify a constitutional violation as related to FDCF; it declined to consider the claims related to IMCC, MPCF, or PCJ due to its lack of jurisdiction. Kudron refiled his Complaint in the Northern District of Iowa, on January 30, 2019 (the instant case; *Kudron III*). (ECF 1). *Kudron III* named some different Defendants than in his two previous cases, but stated claims identical to those stated in *Kudron II*. (ECF 4).

*Kudron III* was transferred to this district on July 19, 2018. (ECF 2). On August 15, 2018, upon Initial Review, this Court directed the Clerk of Court to find counsel to represent Kudron, and for counsel to file an Amended and Substituted Complaint naming the correct Defendants.

(ECF 5). This Court found that because the Northern District adjudicated his claims related to FDCF, Kudron is precluded from raising them again in this District. *See Aziz v. Burrows,* 976 F.2d 1158, 1158 (8th Cir. 1992) (courts may dismiss a duplicative complaint raising issues directly related to issues in another pending action brought by the same party).

Counsel for Kudron entered an appearance, *pro bono publico*, on August 21, 2018. (ECF 6). Kudron filed his First Amended Complaint in February 2019, against Defendants former Sheriff William McCarthy, IDOC physician Edward O'Brien, Corizon Health, Inc., Unknown PCJ Doctor, and Unknown IMCC Employees. (ECF 17). Upon its Further Initial Review, the Court found that Kudron's claims were sufficient to proceed with Service of Process. (ECF 18).

On June 14, 2019, the Court granted Kudron's Motion to Dismiss Defendant Corizon Health, Inc., as they had not provided health services to PCJ during the relevant times. (ECF 26). On the same day, Defendant Dr. O'Brien filed an Answer (ECF 29), and Defendant William McCarthy filed a Motion to Dismiss the claims against him. (ECF 30). On July 31, 2019, Kudron filed his Resistance. (ECF 35).

Kudron filed a Second Amended and Substituted Complaint in August 2019 (ECF 42), naming Sheriff William McCarthy, Wellpath, LLC, Dr. William Ingram, and Dr. Edward O'Brien as Defendants in their individual capacities. This Second Amended Complaint only substituted Defendants Wellpath and Dr. Ingram, for Corizon Health and "Unknown Doctor," and removed the "Doe" Defendants; it did not change the substance of Kudron's claims. (*See* ECF 17 at ¶ 7–9; ECF 42 at ¶ 7–8). In his Second Amended Complaint, Kudron alleges that all Defendants violated his Eighth and Fourteenth Amendment rights when they: (1) acted with deliberate indifference to his serious medical needs by failing to provide him adequate medical care and treatment after he was injured in a 2016 fight with another inmate at the PCJ; and (2) failed to protect his health at the PCJ and at state correctional facilities with adequate nutrition and bunk arrangements. Upon further review of the claims, the Court again found that Kudron's claims were not frivolous. (ECF 43).

On November 7, 2019, Dr. O'Brien filed a Motion for Summary Judgment (ECF 48); Kudron responded on February 11, 2020. (ECF 68). On December 31, 2019, Wellpath and Dr. Ingram filed a Motion to Dismiss Kudron's Second Amended Complaint (ECF 59); Kudron

responded on February 11, 2020. (ECF 69). Wellpath and Dr. Ingram replied on February 18, 2020. (ECF 70).

## IV.   ANALYSIS

### A.  Standard for 42 U.S.C. § 1983 Claims

Pursuant to 42 U.S.C. § 1983, Kudron brings his claims for money damages, alleging that Defendants, in their individual capacities, violated his Eighth and Fourteenth Amendment rights when they: (1) acted with deliberate indifference to his serious medical needs by failing to provide him ongoing medical care and treatment for his injuries that resulted from a 2016 assault at PCJ; and (2) failed to protect his health by failing to provide adequate nutrition for a person of his size, proper bunk assignments for someone with his injuries, and an appropriate mattress for his back pain. (ECF 42). Kudron asserts these § 1983 claims against all Defendants, but offers few specifics as what actions he attributes to each Defendant.

To state a claim under § 1983, a Plaintiff must allege: (1) that the Defendant acted under color of state law; and (2) that the alleged conduct deprived the Plaintiff of a constitutionally protected federal right. *Van Zee v. Hanson,* 630 F.3d 1126, 1128 (8th Cir. 2011). Pretrial detainees have the same Eighth and Fourteenth Amendment rights as prisoners under the Due Process Clause. *Barton v. Taber*, 908 F.3d 1119, 1123–24 (8th Cir. 2018).

### 1.  Standard for Deliberate Indifference to Serious Medical Needs

To succeed on a claim of deliberate indifference to a serious medical need, a pretrial detainee or prisoner must demonstrate an objectively serious medical need that the defendant official knew about, but deliberately disregarded. *Barton*, 908 F.3d at 1124. "Deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983 for violation of the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). Deliberate indifference is "akin to criminal recklessness," so mere negligence is insufficient. *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006).

In evaluating whether an official is deliberately indifferent to a serious medical need, courts should consider that inmates have a right to adequate medical care, but not to receive a particular or requested course of treatment. *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Doctors are free to exercise their independent medical judgment. *Id.* Mere disagreement with treatment decisions does not rise to the level of a constitutional violation. *Fourte v. Faulkner Cty., Ark.*, 746 F.3d 284, 287

(8th Cir. 2014). Allegations that a medical care provider should have recognized certain symptoms and connected them to a specific diagnosis is not sufficient to demonstrate deliberate indifference to a serious medical need, but only shows disagreement with the care provided. *Hanic v. Schaeffer*, 58 Fed. Appx. 665, 666 (8th Cir. 2003). A showing of medical negligence does not state a valid claim of deliberate indifference to a serious medical need. *Barr*, 909 F.3d at 921–922.

### 2. Standard for Failure-to-Protect Claims: Pretrial Detainees and Prisoners

Eighth Amendment protections against cruel and unusual punishment also extend to conditions of incarceration and confinement. *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017). Prisons must provide prisoners and detainees with basic necessities, but a minimal deprivation does not violate the Constitution. *Ingram v. Cole Cty.*, 846 F.3d 282, 285 (8th Cir. 2017) (citing *Green v. Baron*, 879 F.2d 305, 309 (8th Cir. 1989)), *aff'd.* 732 Fed. Appx. 496, 496 (8th Cir. 2018) (en banc). Temporary discomfort is not enough to support a claim of a constitutional violation. *Id.*

For failure-to-protect claims, a prisoner must show that a prison official was deliberately indifferent to a substantial risk of serious harm. *Whitson v. Stone Co. Jail*, 602 F.3d 920, 923 (8th Cir. 2010). The prisoner must satisfy the two-pronged test for deliberate indifference, showing that he was incarcerated under conditions posing a substantial risk of harm, and that prison official was deliberately indifferent to that risk. *Flemons v. Devane*, 779 Fed. Appx. 423, 424 (8th Cir. 2019). Mere negligence does not rise to the level of deliberate indifference. *Kulkay*, 847 F.3d at 642.

The proper inquiry in evaluating the constitutionality of pretrial-detention conditions, as opposed to prison conditions, is whether those conditions amount to punishment of the detainee. *Ingram*, 846 F.3d at 285 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). "Loss of freedom of choice and privacy are inherent incidents of [jail or prison] confinement." *Bell*, 441 U.S. at 537. "And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id.*

The first question in evaluating whether a pretrial-detention condition is "punishment," is whether a given imposition rises above "a *de minimis* level...with which the Constitution is not concerned." *Ingram*, 846 F.3d at 285. The second question is whether a condition or restriction

"amounts to punishment in the constitutional sense." *Id.* A pretrial-detention condition or restriction does not, without more, amount to punishment if it is reasonably related to a legitimate governmental objective. *Id.* However, if it is arbitrary or purposeless, a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees. *Id.*

### 3. § 1983 Claims Require a Causal Link – No Liability under *Respondeat Superior* Theory

"Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th 1990). The theory of *respondeat superior* is not an independent basis for § 1983 relief. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–92 (1978).

Deliberate indifference may be shown as to a public official when the actor knew of the constitutional risk posed by their inadequate training, supervision or policies, and failed to take sufficient remedial action. *Walton v. Dawson,* 752 F.3d 1109, 1118 (8th Cir. 2014). "[G]eneral responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997).

Likewise, a corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("The test is whether there exists a policy, custom or action by those who represent official policy which inflicts an injury actionable under § 1983.")).

### B. Motions to Dismiss for Failure to State a Claim

### 1. Motion to Dismiss Standard

A court may dismiss a claim if the Complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Motion to Dismiss, the complaint must state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A plausible claim is one that contains sufficient factual matter to allow the Court to draw the reasonable inference that the Defendant is liable for the alleged misconduct, and "raise[s] a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is insufficient; the Complaint must go beyond bald assertions that lack any factual support. *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404–05 (8th Cir. 2017). To state a viable claim under § 1983 with respect to named individual

Defendants, a Plaintiff must demonstrate "a causal link to, and direct responsibility for, the deprivation of rights" at issue. *Turner v. Mull*, 784 F.3d 485, 493 (8th Cir. 2015) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)).

For the purposes of this Report and Recommendation on Defendants' Motions to Dismiss (ECF 30, 59), the Court considers all of Kudron's factual allegations to be true; however, it need not accept his legal conclusions. *Twombly*, 550 U.S. at 555.

### 2. Motion to Dismiss: Defendants Wellpath and Dr. Ingram (ECF 59)

In his Second Amended Complaint (ECF 42), Kudron claimed that Defendants Wellpath and Dr. Ingram were: (1) deliberately indifferent to his serious medical needs after an assault at the PCJ in 2016; and (2) failed to protect his health by failing to provide adequate nutrition, bunk arrangements, and mattress assignments. Kudron states that Dr. Ingram was deliberately indifferent to his serious medical needs when he told Kudron that sutures in his nose would dissolve after a short period of time, when in fact, the sutures did not dissolve. (*Id.* at ¶ 17–18). He alleges that Wellpath and staff provided him "mediocre medical attention" by failing to properly remove his sutures, causing a blood infection that further damaged his sinuses and brain. *Id.* Kudron further states that he was not provided proper antibiotics or pain medications while at PCJ. (*Id.* at ¶ 23). As the provider of medical services to the PCJ during the relevant period, the Court infers that this claim is attributed to Wellpath, and particularly to Wellpath's policies, although which policies are not identified. Kudron offers no expert testimony about the cause or extent of any blood infection he suffered after his July 2016 assault, or about what medication he should have been prescribed in addition to medication he received while at the PCJ. He does not state that he requested assistance from Dr. Ingram relating to removal of his stitches, or how other staff failed to attend to his medical needs, regardless of whether his medical needs were serious. Kudron does not state any facts in his Second Amended Complaint (ECF 42), or in his Affidavit (ECF 68-3),[4] that support his allegations that Wellpath and Dr. Ingram were deliberately indifferent to Kudron's nutrition, his mattress assignment, or his bunk arrangement, or that these Defendants were in any way involved in the application of the PCJ policies relating to these issues.

---

[4] Plaintiff's Affidavit (ECF 68-3) is "necessarily embraced" by the Complaint, and thus not a matter outside the pleadings. *See Ashanti*, 666 F.3d at 1151 (In considering a Motion to Dismiss, the Court may consider those documents "whose contents are alleged in a [C]omplaint and whose authenticity no party questions, but which are not physically attached to the [Complaint].").

Defendants Wellpath and Dr. Ingram move to dismiss the claims against them pursuant to Rule 12(b)(6), arguing that Wellpath cannot be liable under the principle of *respondeat superior*, and that Kudron's allegations against Dr. Ingram are no more than his mere disagreement with treatment. Alternatively, these Defendants argue that if all facts are assumed true, the claims might possibly rise to the level of negligence, but not to a constitutional claim for deliberate indifference to a medical or health need. (ECF 59). Kudron resists Defendants' Motion to Dismiss, by arguing that he provided sufficient facts on the face of the Second Amended Complaint to make plausible allegations against Wellpath and Dr. Ingram. (ECF 69).

### i. Failure to Protect his Health: Nutrition, Mattress or Bunk Assignment

Beyond his bald assertions, Kudron failed to state any facts in the Second Amended Complaint (ECF 42) or his Affidavit (ECF 68-3), that support his claims that Defendants Wellpath and Dr. Ingram failed to protect his health in any way related to the PCJ policies for nutrition, mattresses, or bunk assignment. *See Neubauer*, 849 F.3d at 404–05 (the Complaint must go beyond bald assertions without any factual support). To survive a Motion to Dismiss on the issue of whether Defendants failed to protect Kudron's health through the policies that govern the  conditions for pretrial detainees at PCJ, he must provide at least some facts to show: (1) that a given condition imposed upon him resulted in more than "a *de minimis* level [of imposition]... with which the Constitution is not concerned"; and (2) that the condition or restriction "amounts to punishment in the constitutional sense." *Ingram*, 846 F.3d at 285. A pretrial-detention condition or restriction does not, without more, amount to punishment if it is reasonably related to a legitimate governmental objective; but a court may permissibly infer that a governmental action is punishment if the condition or restriction is arbitrary or purposeless. *Id.*

Assuming that Kudron's factual allegations in his Complaint and Affidavit showed that the PCJ policies for nutrition and bunk assignment or mattresses, as applied to him, resulted in more than a *de minimis* level of harm, such an imposition did not amount to punishment by either Dr. Ingram or Wellpath staff. First, Kudron has failed to show that Dr. Ingram or any Wellpath staff had any input as to his nutrition, bunk arrangement, or mattress assignment under these policies or otherwise. Second, he has failed to offer any facts showing that either Defendant knew of Kudron's complaints about inadequate nutrition or his bunk and mattress conditions. Kudron provides no facts to support his claim that Dr. Ingram or Wellpath deliberately disregarded any potential risk of harm that Kudron might have suffered under the PCJ policies

on nutrition, bunk assignment or mattresses. Although under the PCJ policy, these Defendants, as part of the PCJ medical team, could have been asked to determine the medical necessity for any accommodations Kudron wanted at the PCJ, Kudron did not state that he requested a modification to any of these conditions from any PCJ staff, or had any contact with Wellpath or Dr. Ingram related to his mattress or bunk conditions and the application of PCJ policies.

The Court recommends that Defendants Wellpath's and Dr. Ingram's Motion to Dismiss (ECF 59) Kudron's claims that these Defendants failed to protect his health be GRANTED, and that this claim against Defendants Wellpath and Dr. Ingram be DISMISSED.

### ii. Deliberate Indifference to Kudron's Serious Medical Needs: Defendant Wellpath

Defendants argue that Wellpath cannot be held liable under the principle of *respondeat superior.* (ECF 59). In his Resistance to Defendants' Motion to Dismiss, Kudron argues that Wellpath should be held liable because it is acting under the color of state law in providing services to inmates at PCJ. (ECF 69). Kudron did not respond to Defendants' assertion that Wellpath cannot be held liable under the theory of *respondeat superior*. *Id.*

In the Second Amended Complaint, Kudron alleges that Wellpath staff provided him "mediocre medical attention" while at the PCJ, by failing to properly remove the sutures in his nose, resulting in a blood infection that further traumatized his sinuses and brain, and by failing to provide him adequate antibiotics or pain medicine. (ECF 42 at ¶ 17–18, 23). Based upon this assertion, Kudron's claim that Defendant Wellpath was deliberately indifferent to his serious medical needs can only be read as requesting recovery based upon the theory of *respondeat superior* either relating to its policies, or lack of staff training. *Monell*, 436 U.S. at 690. Kudron did not identify any policies or customs of widespread misconduct by Wellpath that caused him any injury; only that the failure of its staff to properly remove his sutures caused him an infection, and that he disagreed with the type of treatment provided.

Viewing the factual allegations in the Second Amended Complaint as true, Kudron has failed to state any claim related to a Wellpath policy, or its failure to properly train its employees. It is recommended that Defendant Wellpath's Motion to Dismiss (ECF 59) as to Kudron's claim that it was deliberately indifferent to his serious medical needs be GRANTED, and this claim be DISMISSED.

### iii. Deliberate Indifference to Kudron's Serious Medical Needs: Defendant Dr. Ingram

Kudron claims that Dr. Ingram was deliberately indifferent toward his serious medical needs when he told Kudron that sutures in his nose would dissolve after a short period of time. (ECF 42 at ¶ 17–18). He alleges that the failure of the sutures to dissolve or properly be removed led to a blood infection, which caused him pain. *Id.* Kudron did not provide any expert testimony or medical records to show when his alleged infection developed, by whom it was treated, or if it was related to the sutures. He provides no facts showing how Dr. Ingram was involved in Kudron's ongoing care after his August 14, 2016, injuries.

Accepting as true Kudron's claims that he had a serious medical condition resulting from a fight at PCJ in August 2016, and that he developed an infection from the sutures that was not properly treated, Kudron has failed to provide any facts to implicate Dr. Ingram. For example, he has not asserted: that Dr. Ingram treated him after the sutures were placed; that Dr. Ingram had any responsibility for the failure to properly remove his sutures; that Dr. Ingram had any ongoing responsibility for Kudron's access to medication (by prescription or over-the-counter) while at PCJ; or that Dr. Ingram took any action that amounted to more than negligence, or to Kudron's disagreement with the treatment plan. Kudron does not allege any facts that show Dr. Ingram knowingly misinformed Kudron regarding the need for removal of his sutures in order to cause him pain, or that Dr. Ingram otherwise knew of any serious medical needs that Kudron developed after the placement of his sutures, including a blood infection, pain, or discomfort.

Dr. Ingram's advice to Kudron regarding care for his dissolving sutures, assuming that this advice was given, does not provide the basis to infer that Dr. Ingram or any other Wellpath employees failed to properly remove the sutures, or that any resulting infection was not properly treated. Kudron has not provided more than his bald assertions and inferences that Dr. Ingram was mistaken as to the type of sutures, and that this resulted in harm. *See Neubauer*, 849 F.3d at 404–05 (the Complaint must go beyond bald assertions without any factual support). This is neither an "unnecessary and wanton infliction of pain" nor a level of care that is "repugnant to the conscience of mankind," as required to succeed on a claim of deliberate indifference to a serious medical need; at most, it is medical negligence. *Estelle*, 429 U.S. at 103. Kudron's claims about Dr. Ingram's action or advice regarding the type of sutures used in August 2016 do not rise to the level of a constitutional violation under 42 U.S.C. § 1983. *See Cejvanovic v. Ludwick*, 923 F.3d 503, 507–508 (8th Cir. 2019) (citing *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000))

("The allegation that 'what is being done by the Defendants is completely inadequate' is the kind of 'mere disagreement with treatment decisions [that] does not rise to the level of a constitutional violation.'").

Viewing the factual allegations in the Second Amended Complaint as true, Kudron has failed to sufficiently plead his claim that Defendant Dr. Ingram was deliberately indifferent to his serious medical needs while at the PCJ. It is recommended that Defendant Ingram's Motion to Dismiss (ECF 59) as to this claim be GRANTED, and this claim against Dr. Ingram be DISMISSED.

### 3. Motion to Dismiss: Defendant McCarthy (ECF 30)

Sheriff McCarthy argues that Kudron's claims against him must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim. (ECF 30). Kudron asserts that he sufficiently stated a claim that McCarthy, as Sheriff, implemented the PCJ policies regarding his nutrition and sleeping arrangements; he asserts that these policies were unconstitutionally applied to him. (ECF 35-1 at 4–5). Kudron asserts that McCarthy violated his Eighth and Fourteenth Amendment rights when he: (1) was deliberately indifferent to his serious medical needs; and (2) failed to protect his health by failing to provide adequate nutrition, and failing to assign him a proper bunk and mattress. (ECF 42). Kudron asserts these claims against McCarthy in his individual capacity, stating that McCarthy was responsible for PCJ policies relating to these issues. However, in his Response to McCarthy's Motion to Dismiss (ECF 35), Kudron concedes that McCarthy "did not personally deny him anything," and that McCarthy should only be held liable in relation to his official responsibility for PCJ policies.

### i. Deliberate Indifference to Serious Medical Needs

Kudron has failed to state any facts in either of his Amended Complaints or in his Affidavit that allege how McCarthy was deliberately indifferent to Kudron's serious medical needs. In his Response to Defendant McCarthy's Motion to Dismiss (ECF 35-1), referring to the First Amended Complaint (ECF 17),[5] Kudron concedes that he "has not made claims [that] Defendant McCarthy failed to provide medical care," but that the "outside medical provider bears the responsibility and liability of medical care and treatment for Polk County Jail inmates." (ECF 35-1 at 5). Because Kudron has not pled any facts to support his claim that McCarthy did,

---

[5] There is no substantive difference in the claims, only the parties, in the First and Second Amended Complaints. See, *supra*, page 8. McCarthy was named as a Defendant in both Amended Complaints.

or failed to do, anything that was deliberately indifferent to any of his serious medical needs, it is recommended that McCarthy's Motion to Dismiss (ECF 30) as to this claim be GRANTED.

### ii.    Failure to Protect: Nutrition, Mattress and Bunk Assignment

Kudron alleges that Sheriff McCarthy oversaw the application of PCJ's nutrition, bunk and mattress assignment policies, and that these policies were unconstitutionally applied to him. (ECF 42 at ¶ 24–26). Kudron admitted in his Response to McCarthy's Motion to Dismiss that McCarthy did not personally make any decisions relating to his nutrition, bunk or mattress assignments. (ECF 35-1 at 5). He asserts only that McCarthy, as Polk County Sheriff during the relevant time period, should be held liable for the pain and suffering caused by the application of the "inadequate and unconstitutional" PCJ policies. (ECF 35 at ¶ 4(c)). Defendant McCarthy argues that this claim against him should be dismissed, as Kudron has failed to state any facts showing that the PCJ policies were unconstitutional, or that the policies exposed Kudron to any serious risk of harm. (ECF 30).

To prove that Defendants failed to protect Kudron's health as to his pretrial conditions at PCJ, Kudron must prove that: (1) a given condition of his confinement was greater than that of "a *de minimis* level [of imposition] ... with which the Constitution is not concerned"; and (2) that the condition or restriction "amounts to punishment in the constitutional sense." *Ingram*, 846 F.3d at 285 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). A pretrial-detention condition or restriction does not, without more, amount to punishment if it is reasonably related to a legitimate governmental objective; but a court may permissibly infer that a governmental action is punishment if it is arbitrary or purposeless. *Id.*

Kudron's claims related to his bunk and mattress assignments do not rise above a *de minimis* level of imposition, nor are these policies arbitrary or purposeless. Kudron claims that he had trouble navigating from his upper bunk due to depth perception issues and the absence of pain medications to alleviate related pain, but was denied a lower bunk restriction. (ECF 42 at ¶ 24–25). He does not identify how many levels of bunks were available in his housing unit at the PCJ, or how they were assigned. He does not specify how high off the floor his "upper" bunk was. He also claims that a "proper" mattress would have alleviated his back pain, but does not describe what a "proper" mattress was. (*Id.* at ¶ 26). Kudron fails to offer any facts showing that he had a diagnosed medical issue that warranted a bunk or mattress restriction, that he complained of these issues to PCJ staff, that he submitted any requests for a lower bunk or

alternative mattress to PCJ staff pursuant to PCJ's bunk policy as an accommodation for any back pain or other medical issues, or that Defendant McCarthy failed to train his staff regarding implementation of the bunk or mattress assignment policy. The facts in the record give the Court no basis to infer that the policies were purposeless or arbitrary, or that the jail staff deviated from its policy as to Kudron's bunk assignment or providing an alternate mattress, if one was required. *See Ingram*, 846 F.3d at 285.

Similarly, Kudron's claims related to his nutrition do not rise above a *de minimis* level of imposition. There is no evidence in the record for the Court to infer that the policy itself was arbitrary or purposeless. The policy provides that inmates receive three meals per day; that the meals are "nutritionally complete" as approved by a licensed dietitian; that special diets are available for those who require them for medical or religious reasons upon request to PCJ medical staff; and that additional food items are available for inmates to purchase from the commissary. (Ex. A, ECF 30-1). Even if Kudron lost twenty pounds during his stay at the PCJ, which began sometime before August 2016, and ended April 13, 2017, when he transferred to IMCC, he failed to allege what his weight was before and after his stay at the PCJ. He provided no records stating that he asked PCJ or Wellpath staff to address his weight loss or any special nutritional needs. He did not provide any facts or records to support a claim that he could not supplement his meal plan with additional food purchased from the commissary, at least until any request for supplemental food from the PCJ could be addressed.

Even assuming that PCJ's nutrition and bunk policies offered more than *de minimus* imposition on Kudron's health, he failed to show that Sheriff McCarthy knew that the PCJ policies posed a risk of harm to Kudron, or that he failed to properly train PCJ employees to implement these policies. The only direct allegation concerning Sheriff McCarthy in the Second Amended Complaint is: "Polk County Jail, through Defendant McCarthy, have [sic] a policy to provide nutrition to inmates; however, this policy is inadequate and violates constitutional protections." (ECF 42 at ¶ 20). Kudron has not pled any facts that state, or allow the inference, that the bunk, mattress, or nutrition policies at the PCJ are applied in a continuing, widespread, or persistent pattern resulting in unconstitutional harm to detainees.

The Court recommends that Kudron's claim that Defendant McCarthy failed to protect his health in relation to PCJ nutrition, mattress and bunk policies be DISMISSED, and Defendant McCarthy's Motion to Dismiss (ECF 30) be GRANTED.

### C. Motion for Summary Judgment: Defendant Dr. O'Brien's (ECF 48)

#### 1. Claims against Dr. O'Brien

In his Second Amended Complaint (ECF 42), Kudron claimed that during his time at IMCC, Dr. O'Brien was: (1) deliberately indifferent to his serious medical needs, and (2) failed to protect his health with regard to bunk and nutrition policies. Kudron claims that when he was assigned to IMCC, he was provided only basic medical care and an intake evaluation. (ECF 42 at ¶ 27). Kudron felt that Dr. O'Brien and staff trivialized his pain and suffering during this evaluation process, as Kudron was only able to discuss his previous injuries and current pain and suffering, but not his observations about his current and long-term injuries. (ECF 68-3 at ¶ 13). Kudron also claimed that during his time at IMCC, he was provided an unmarked bottle that contained a blue substance with a strange odor to use as soap and shampoo. (ECF 42 at ¶ 28–29, 31–32). Kudron believes this soap caused his basal cell carcinoma, which was later surgically removed at UIHC. (ECF 42 at ¶ 33–36; ECF 68-3 at ¶ 16–17). Although this allegation chronologically follows other allegations against Dr. O'Brien in the Second Amended Complaint, Kudron does not allege that he was treated by or that he had any contact with Dr. O'Brien relating to his concerns about the ingredients in this soap. Neither does he offer anything beyond his own conclusion that the soap caused the lump on his head. He did not complain to IMCC staff or Dr. O'Brien about this condition. Kudron provides no facts relating to his bunk assignment or the nutritional policies at IMCC, or any facts to show that Dr. O'Brien had any responsibility for, or input on, these issues as they relate to Kudron's three weeks at IMCC, from April 13, 2017, to May 4, 2017.

#### 2. Summary Judgment Standard

The Court shall grant Defendant Dr. O'Brien's Motion for Summary Judgment (ECF 48) if he shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant shows there is no genuine dispute as to any material fact precluding judgment in his or her favor, the burden shifts to the nonmoving party, who, by affidavit or other evidence in the record, must set forth specific facts showing that a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 249. The nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." *Doe v. Sauer*, 186 F.3d 903, 905 (8th Cir. 1999). This is

more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The quantum of proof that the nonmovant must produce is not precisely measurable, but it must be enough evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The Court "review[s] the evidence and the inferences that reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Davis*, 685 F.3d at 680 (internal quotation marks omitted). Viewing the record in the light most favorable to the nonmoving party does not include the acceptance of "unreasonable inferences or sheer speculation as fact." *See Mann*, 497 F.3d at 827 (quoting *Howard*, 363 F.3d at 800).

### 3. Standard for Deliberate Indifference to Serious Medical Needs

Kudron states that after he was convicted and sentenced to IDOC custody, he was dissatisfied with his "basic" medical care while at IMCC, which included an examination and physical history intake by Dr. O'Brien. While inmates have a right to adequate medical care, they have no right to receive a particular or requested course of treatment. *Barr*, 909 F.3d at 921 (citing *Dulany*, 132 F.3d at 1239). Doctors are free to exercise their independent medical judgment. *Id.* Mere disagreement with treatment decisions does not rise to the level of a constitutional violation. *Fourte*, 746 F.3d at 287.

### 4. Standard for Exhaustion of Administrative Remedies

Under 42 U.S.C. § 1997e(a), exhaustion of administrative remedies is required as a precondition to any action by a prisoner concerning the conditions of his confinement. The exhaustion requirement is mandatory. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). If a prisoner fails to exhaust his administrative remedies prior to filing his lawsuit, the suit will be dismissed. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

The purpose of this requirement is to resolve problems as they arise, and to avoid needless expense and delay in addressing constitutional claims. *See Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (citing *Porter v. Nussle*, 534 U.S. 516, 524–525 (2002)). In addition to providing Defendants protection from lawsuits, the prison grievance systems should offer meaningful relief to inmates. *Id.*

### 5. Analysis of Defendant Dr. O'Brien's Motion for Summary Judgment

Dr. O'Brien argues that he is entitled to Summary Judgment on claims that he was deliberately indifferent to Kudron's serious medical needs and failed to protect Kudron's health

because: (1) Kudron failed to fully exhaust any of his available grievances; and (2) none of Kudron's seven grievances filed at MPCF and FDCF were about Dr. O'Brien or related to Kudron's medical treatment at IMCC. (ECF 48). In response to Dr. O'Brien's Motion for Summary Judgment, Kudron argues that he exhausted his administrative remedies to the extent he was able; and that during his time at MPCF and FDCF, he filed grievance appeals to the Central Office, as required by the Grievance Policy, but his appeals were "lost" or "never received." Kudron does not assert that he used the grievance system while at IMCC, or was prevented from using the grievance system for any of his complaints about medical treatment or other issues. (ECF 68-2).

In 2017, Defendant Dr. O'Brien was employed by IDOC as a medical doctor at IMCC. (*See* ECF 42 at ¶ 9). Kudron did not file a single grievance while at IMCC. (*See* ECF 48-3 at 31–61). Kudron's sole allegation in his Second Amended Complaint against Defendant Dr. O'Brien is that he "trivialized Kudron's pain and suffering" during a basic intake medical examination upon Kudron's admission to IMCC, and that Kudron felt that he was not given sufficient time at this exam to explain his ongoing or possible long-term medical issues, although he was allowed to discuss his existing pain issues. (ECF 42 at ¶ 27; ECF 68-3 at ¶ 13).

The Court finds that Kudron's assertion that the blue soap provided to him at IMCC resulted in his basal cell carcinoma does not state a claim against Dr. O'Brien. Kudron failed to allege in his Second Amended Complaint that Dr. O'Brien knew of, or had any part in providing this soap to IMCC prisoners or that use of the blue soap could result in harm (including basal cell carcinoma), or that Dr. O'Brien knew of, or failed to treat, Kudron's complaints of a lump on his head.

Kudron now argues in Response to Dr. O'Brien's Motion for Summary Judgment (ECF 68) that the IDOC Grievance Process as a whole was unavailable to him during April and May 2017 when he was at IMCC, because some of his later grievance appeals at FDCF from August 2017 through April 2018 were lost in the mail or held up by IDOC mailroom staff. Kudron infers that mailroom staff at FDCF were attempting to interfere with his ability to file lawsuits and grievances against them, by delaying or blocking the grievance process. (*See* Kudron Aff., ECF 68-3 at ¶ 19–30).[6] Kudron does not explain how the treatment of any

---

[6] Plaintiff states in his Affidavit: "I directed my Appeals to the appropriate personnel, but I am not sure whether they were delivered as I never got a response. Inmates must mail their grievance appeals and the mail is handled by the

grievance appeals that he filed at MPCF in July 2017 or later at FDCF, interfered with or made the grievance policy unavailable to him at IMCC in April and May of 2017. Viewing the evidence in the record in the light most favorable to Kudron, the Court finds that the IDOC Grievance Process was available to him while he was at IMCC, and that he did not use it.

Even if the Court were to accept Kudron's unreasonable inferences and sheer speculation that his use of the grievance procedure at IMCC was futile, he has not stated sufficient facts to support a claim that Dr. O'Brien was deliberately indifferent to any of his serious medical needs. Kudron speculates that he had a serious medical need in the three weeks he was at IMCC. Kudron acknowledges that he received medical care while at IMCC, though perhaps not the type of care he preferred. He does not allege any facts to show that what he describes as "basic" medical care, or Dr. O'Brien's alleged trivializing of Kudron's injuries upon his intake exam, in any way harmed him. At best, Kudron disagreed with Dr. O'Brien's treatment; mere disagreement with treatment decisions does not rise to the level of a constitutional violation. *Fourte,* 746 F.3d at 287.

Kudron does not state any facts to support his claim that Dr. O'Brien failed to protect his health while at IMCC. Kudron's claims related to the blue soap do not show that he was treated by, or that he had any contact with, Dr. O'Brien relating to his concerns about the ingredients in this soap. He does not allege that he complained about this blue soap to Dr. O'Brien or any IMCC staff, or that Dr. O'Brien treated any medical condition caused by this soap. Kudron offers no medical reports or expert opinions to support his speculation that his basal cell carcinoma manifested itself in the lump on his head, or that Dr. O'Brien knew of and failed to care for his basal cell carcinoma, which was removed in September 2017, while Kudron was in the care of FDCF. Neither does Kudron offer any facts relating to his bunk assignment or the nutritional policies at IMCC, or to show that Dr. O'Brien had any responsibility for, or input on, these issues as they relate to Kudron's time at IMCC, which was from April 13, 2017, to May 4, 2017.

Kudron has failed to exhaust his administrative remedies as to any of his complaints arising from his stay or treatment at IMCC by Dr. O'Brien, and has not raised a genuine dispute of material fact on his complaint that Dr. O'Brien was deliberately indifferent to his serious medical needs or failed to protect his health by any decisions relating to his soap, bunk

---

Defendants and staff working for the Iowa Department of Corrections. These are the very same people I am filing grievances against." (ECF 68-3 at ¶ 23, 27, 30).

assignment, or nutrition while at IMCC. The Court recommends that Defendant Dr. O'Brien's Motion for Summary Judgment (ECF 48) be GRANTED, and the claims against Defendant Dr. O'Brien be DISMISSED.

## V.   CONCLUSION

The Court finds that: (1) Kudron has failed to state a claim upon which relief can be granted as to Defendants Wellpath and Dr. Ingram, and recommends that pursuant to Fed. R. Civ. P. 12(b)(6) their Motion to Dismiss (ECF 59) be GRANTED; (2) Kudron has failed to state a claim upon which relief can be granted as to Defendant McCarthy, and recommends that pursuant to Fed. R. Civ. P. 12(b)(6) his Motion to Dismiss (ECF 30) be GRANTED; and (3) Kudron has failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a), and that even if exhaustion of the grievance procedure at IMCC was excused, viewing the facts in the light most favorable to Kudron, there are no material facts in dispute to support his claim for deliberate indifference to his serious medical needs, or for failure to protect his health due to the nutrition provided and his bunk assignment at IMCC; it is recommended that Defendant Dr. O'Brien's Motion for Summary Judgment (ECF 48) be GRANTED.

## VI.   REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that:

1)  Defendants Wellpath's and Dr. Ingram's Motion to Dismiss (ECF 59) be GRANTED;

2)  Defendant McCarthy's Motion to Dismiss (ECF 30) be GRANTED; and

3)  Defendant Dr. O'Brien's Motion for Summary Judgment (ECF 48) be GRANTED.

IT IS ORDERED that the parties have until fourteen days from the date of the Notice of Electronic Filing of this ruling to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C), and Local Rule 5A(j). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *see also St. Jude Med. S.C., Inc. v. Tormey*, 779 F.3d 894, 902 (8th Cir. 2015) (citing *McDonald v. City of St. Paul*, 679 F.3d 698, 709 (8th Cir. 2012)). Failure to timely file objections may constitute a waiver of Plaintiff's right to appeal questions of fact. *Flemons*, 779 Fed. Appx. at 424 (citing *Daley v. Marriot Int'l, Inc.*, 415 F.3d, 893 n.9 (8th Cir. 2005)).

IT IS SO ORDERED.

Dated this 6th day of April, 2020.

CELESTE F. BREMER
UNITED STATES MAGISTRATE JUDGE